### THE PIERREPONT.

(Circuit Court of Appeals, Second Circuit. December 20, 1917.)

#### No. 37.

COLLISION ⬦⟿95(4)—FERRYBOAT AND TUG LEAVING SLIP—FAULT.

As a tug with a tow on a short hawser, going at four or five miles speed, passed out from a slip on the Brooklyn front of East River and from behind a covered pier, which obstructed the view to the north, a ferryboat was approaching diagonally from that direction to enter her slip, and was close by. The tide was ebb; the tug stopped or backed, but her bow was turned to the southward by the tide; the ferryboat reversed, but did not change her helm, nor succeed in stopping her headway, and struck the tug on the starboard side, near the bow, at nearly right angles. *Held*, that the case was not one to which the starboard hand rule applied, because there was not time for the vessel to navigate on that assumption, but was of special circumstances, within article 27 of the Inland Rules (30 Stat. 102, Comp. St. 1916, § 7901), and that, the fault of the tug not being in issue on appeal, the ferryboat was chargeable with contributory fault for not at once porting her helm, which under the conditions would probably have taken her clear of the tug.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by the Edward G. Murray Lighterage & Transportation Company, owner of the tug Murray, against the ferryboat Pierrepont; the Union Ferry Company of New York & Brooklyn, claimant. Decree holding both vessels in fault, from which respondent appeals. Affirmed.

This is an appeal from a decree dividing the damages upon a libel by the owners of the Murray for a collision between the Murray, towing a barge,

and the ferryboat Pierrepont. The collision occurred on the east side of the East River, between Pier 32 and the Old Dominion pier on the Brooklyn side. The District Judge held both vessels at fault and divided the damages.

Pier 32 extends from the bulkhead line some 464 feet into the East River. It is 70 feet in width and covered with a shed, which obscures vision to the north, except for the last 8 or 10 feet. On the day in question two or three barges and the steam tug Downer were moored to the outside of the pier, lapping over the pier end on the southerly side. There were also boats along the south side of the pier. Rudolph's coal wharf projects from the shore between the Old Dominion pier and Pier 32 at an angle to Pier 32 and its south side forms the north side of the north ferry rack. The south side of the south ferry rack is formed by the Old Dominion pier. As a result of the angle at which Rudolph's pier projects from the shore, the exit between the end of Rudolph's pier and the south side of Pier 32 is about 105 feet. At the point of Rudolph's pier lay the Rudolph, a steam lighter about 30 feet in beam, and along the south side of Pier 32 there were several vessels moored, probably all about the same width. The passageway between these boats was therefore not much over 40 or 50 feet. The Murray had gone into the bulkhead on the south side of Pier 32 to pick up a barge, which she took in tow upon a hawser of some 10 or 12 feet. She emerged out of the slip, not keeping close to the south side of Pier 32, because of the boats moored there. She came out under one bell at about 4 or 5 miles an hour, but did not drift down with the full of the ebb tide until near the end of the pier, where she began to feel its effect. Meanwhile the ferryboat Pierrepont, in order to make her slip on the same ebb tide, had come to the north of Pier 32. Under a port wheel she had turned and was about to come down into her slip, with the tide at an angle to the pier itself. The result was that neither vessel saw the other until the Murray emerged from behind the shed on the pier. At that time the ferry blew her alarms and backed, and the Murray either backed or stopped her way, which of the two is in dispute. The Pierrepont did not change her helm and did not succeed in stopping all her way; the Murray, under the influence of the tide and perhaps of her helm. had headed slightly down stream, so that when the vessels came together they were not far from a right angle in their relative headings. The bow of the Pierrepont struck the Murray about 15 or 20 feet abaft her stem, just under her pilot house, with such force that eventually she sank.

Only the Pierrepont appeals from the decree below.

Pierre M. Brown, of New York City, for the Pierrepont.

James A. Martin, of New York City, for the Murray.

Before WARD and ROGERS, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). It seems to us quite clear that the case is not one of the starboard hand rule. The vessels were not on steady courses, and had not made each other out in time to navigate with respect to each other, on that assumption. The John Rugge, 234 Fed. 861, 148 C. C. A. 459; The Wm. A. Jamison, 241 Fed. 950, 154 C. C. A. 586; The Washington, 241 Fed. 952, 154 C. C. A. 588. The case was therefore one of special circumstances, under article 27 of the Inland Regulations, and each vessel was bound to be controlled by the particular situation with which it was confronted. We are absolved from any consideration of the fault of the Murray, since she does not challenge upon this appeal the finding against her. The only question is of the Pierrepont's fault.

The District Judge found her at fault for failing to port her helm when she first made out the Murray coming out from behind the shed.

His theory was that at that time, if she had hard-aported, being quick in the swing as her quartermaster swore, she would have cleared the Murray, since in fact she struck her but 15 or 20 feet abaft the stem as it was. The Pierrepont was a side-wheeler, and therefore would answer her helm so long as she retained any way. To back, therefore, did not relieve the master from care for his helm.

Three courses seem to have been open to the Pierrepont when the crisis presented itself, either to keep her helm amidships, as she did, to hard-aport and swing down stream, exposing her port quarter to the Murray, or to hard-astarboard. Of these three it seems to us clear that no prudent master would have hard-astarboarded, since this would have brought him either into the barges on the end of Pier 32 or between the Murray and the barges moored to the south side of that pier. Neither of these courses was prudent or permissible. To hard-aport would in all probability have avoided the collision. The Murray had at least stopped her engines, and her own crew swore that she was backing, though this is disputed by the captain of the Rudolph, who saw no quickwater under the stern, and who was in a good position to see. In either case we think that the Pierrepont would have cleared her, if she had ported, as the District Judge found she should have done.

There remains, therefore, only the question whether, in so porting, the ferryboat's exposure of her port quarter was a danger which presented a case of decision in extremis, and justified the master in keeping his helm amidships as he did. We do not think that any such danger presented itself. The speed of the Murray was slight at the outset; she probably had never acquired a headway of more than 4 or 5 miles an hour, and, as we have said, she had at least stopped her engines, so that she was drifting only with her acquired way. Had her stem come in contact with the ferry it would necessarily have touched only the wide fender at the side, and could not have done any serious damage to the vessel itself. It seems to us that prudent navigation required the Pierrepont under the circumstances at once to hard-aport, and that the District Judge was right in holding that her failure to do so was a fault which contributed to the collision.

Decree affirmed, with costs.