THE MARTIN KEHOE.

THE BERNARDSVILLE.

District Court, S. D. New York.

March 28, 1945.

obtained. The Bernardsville had two staff lights and her running lights and head light. She entered the slip head-on and nosed against the float, the bow end of which was toward the river and her mate put a line on the middle bow cleat of the float. Her float man then suspended a lamp on the bottom rung of the box car at the port bow of the float so that it hung below the floor of the car and thus was visible from both front and side. He left a second light on the floor of the float at its port stern and dislodged the lines to the pier. Thereupon the tug backed until she was 150 feet inside the pier end when she had stopped her engines and was drifting backward blew a slip whistle. Pier No. 40, adjoining to the south, is about 150 feet shorter than pier No. 41. After blowing the slip whistle which elicited no response, the tug proceeded to back, the stern line man standing on her stern as lookout. When her stern was 15 feet beyond the pier end he reported all clear to the pilot. The tug then shifted her line to the starboard bow cleat of the float and backed beyond the pier head where her stern swung upriver. By working the tug's engines her pilot then proceeded to work the float out of the slip and into the river so that when the tug was about 150 feet into the river she was stem to the float near its third starboard cleat to which it had shifted the line and substantially up and down stream. The bow of the float was about 180 feet beyond the pier head and the float was moving, but slowly. It was then that the tug's pilot saw the Martin Kehoe, whereupon he blew a single blast.

The tug Martin Kehoe had been proceeding north in the river at a speed of eight knots on a flood tide bound for pier No. 52½ where she was to pick up a tow. She had her staff, head and running lights showing. The Martin Kehoe was moving about 200 feet off the pier ends. Six barges whose tops were 13 feet above the water extended about 180 feet into the river off the end of pier No. 39. When he was 1,200 feet below pier No. 41, the captain of the Martin Kehoe saw the staff lights of the Bernardsville. When he was off pier No. 38 and 700 feet from the port side of the railroad float which the Bernardsville was managing he had already seen the lighted float moving out slowly within the line of the outermost barge off pier No. 39. Then he heard the Bernardsville blow one blast. The master

Purdy & Lamb, of New York City (Edmund F. Lamb, of New York City, of counsel), for libellant.

John E. Morrissey, of New York City, for claimant.

CLANCY, District Judge.

At 8:30 p. m. on March 6th, 1943, the Bernardsville, a Lackawanna tugboat, 95 feet long, entered the slip on the south side of pier No. 41, North River, to pick up a railroad car float which she intended to move to Hoboken. The pilot, mate, a stern line man and a float man constituted her deck crew. The evening at that time was overcast but apparently fair visibility

956

of the Martin Kehoe in return blew twice whereupon the Bernardsville blew an alarm. Nevertheless the Martin Kehoe did not stop her engines. When she was about 300 feet from the side of the float her engines started to back, despite which she struck the port bow corner of the float.

Libellant argues that regardless of the negligence of the Kehoe the Bernardsville was at fault for her failure to maintain a lookout posted on the bow of the car float or the top of the cars; for her failure to hold back immediately upon observing the Kehoe; and for her failure to blow her slip whistle until clear of the pier.

██ The slip whistle was sufficient under The Supply No. 4, 2 Cir., 109 F.2d 101, which requires that it be blown until the vessel is clear of any obstruction from behind which it may be proceeding. The staff lights of the Bernardsville, because pier No. 40 was 150 feet shorter than was pier No. 41, were visible in the pilot house of any northbound vessel within navigating distance despite the barges off pier No. 39 which they topped. They were actually seen by the Kehoe's master when leaving the slip so that even if the whistle had been defective, no causal relation between any such deficiency in it and the collision can be identified.

██ Since the stern lookout of the Bernardsville had correctly reported nothing in sight within the scope of his vision as limited by the barges which extended 180 feet off the end of pier No. 39 and the Bernardsville had immediately thereafter swerved upriver so that her master in his pilot house could see everything that a man on the roof of the cars on the float could see, the complaint of deficiency in lookout in this case means that the master's attention alone was insufficient. But the very existence of the barges off the end of pier No. 39 secured the safety of his vessel and of the float until they were beyond the outermost barge, and he therefore was free to bring the float out under control that far even though he was laboring under the obligation to anticipate the presence of vessels negligently hugging the pier ends. The Supply No. 4, supra. It was before his float reached such thus far safe position that he saw the Kehoe approaching from the south. The Kehoe was already aware of the float's presence. The Kehoe had plenty of time to stop. She was 700 feet off the

float then. The Bernardsville's master had no doubt of her ability for the signal he immediately gave indicated that judgment. The Kehoe's master, who ought to know her ability better than anyone, said that the float was 300 feet away from her when he ported his wheel. He had earlier testified that it was after that porting that he attempted to stop and the complete stop was almost accomplished when he reached the float. The engineer and the master of the Kehoe both said she was backing one minute, but the time during which she was backing is irrelevant to the distance through which she moved before stopping. This is all the testimony in the case on the ability of the Kehoe to stop but she is a comparatively small tugboat and we think it sufficient to warrant a conclusion that she had ample time to take her headway off and come to rest. If it be thought insufficient it is an instance of defect in the proof required of the libellant whose burden it was to prove any inability of the Kehoe to effect a stop in that distance and the reason why such inability should be recognized by another vessel.

██ As we see this case, the Kehoe was intent on making her destination a few blocks north on as straight a line and with as little delay as possible and persisted in her course and her speed despite the plain signs of danger lying in her course when she moved so fast and which she must have recognized without any notice. Her master took a chance on crossing the float's bow and lost. He knew the Bernardsville was coming out and had a right to come out and his awareness of this obliged him to give way. Restatement of the Law of Torts, 301. Comment c. The Bernardsville's first signal fortified her right. Restatement, idem. So did the fact that he was a wrongdoer pursuing his course so near the shore. When the Bernardsville's first signal was blown she was in an altogether safe position with respect to the Kehoe despite the Kehoe's wrongful course. Therefore nothing in that position or the slight motion of her float which was subject to her control was negligent. Her reaching that position was not negligent. The Bernardsville must be judged by what transpired in fact thereafter.

In complaining that the Bernardsville proceeded further out into the river after giving its original signal, libellant stresses McWilliams Bros., Inc. v. Payne, 2 Cir.,

276 F. 917. The Bernardsville's float was in motion, as we have found, but we recall no convincing testimony that the tug proceeded in any direction under power during the brief interval that intervened between the port passing signal and the alarm, and if it did go ahead it had the right to while it awaited acceptance of its ,ignal. Further it would have been in accordance with its own signal. The vessel in the case cited really crossed her own signal when she proceeded further into the river under power.

The libel is dismissed.